IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEFFREY T. GALFORD,
　　　　Plaintiff,

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
　　　　Defendant.

Civil Action No. 5:09CV102
(Judge Stamp)

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment, and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Jeffrey T. Galford ("Plaintiff") filed applications for DIB and SSI in November 2005 and

February 2006, respectively, alleging disability beginning August 27, 2003, due to degenerative disc

disease, L3 rupture, and severe anxiety (R. 124). The applications were denied at the initial and

reconsideration levels (R. 95, 96). Plaintiff requested a hearing, which Administrative Law Judge

("ALJ") Randall W. Moon held on September 18, 2007 (R. 36). Plaintiff, represented by counsel,

testified on his own behalf. John Panza, a Vocational Expert ("VE"), also testified. On February

14, 2008, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in

the Social Security Act, from August 27, 2003, through the date of the decision (R. 33). Plaintiff

requested review of the ALJ's decision by the Appeals Council. Plaintiff did not submit any

additional evidence to the Appeals Council.  The Appeals Council denied Plaintiff's request for review on July 11, 2009 (R. 4), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Jeffrey T. Galford ("Plaintiff") was born May 11, 1965, and was 38 years old on his alleged disability onset date, and 42 on the date of the ALJ's Decision (R. 109, 15).  He obtained his GED in 1985, and completed training as a Heavy Equipment Operator and in Mill and Cabinet/Masonry (R. 130).  He has past relevant work as a construction worker (R.125).  He stopped working on August 27, 2003, when he "fell at work and injured [his] back" (R. 125).

On May 28, 2003, Plaintiff presented to the hospital, stating he had been taking Xanax since 1998, but had recently been dropped by his doctor, or his doctor had left (illegible) and he was out (R. 271).  He was given Xanax, and told to follow up with a new doctor.  He was diagnosed only with anxiety and medication problem.

On June 25, 2003, Plaintiff presented to the hospital with complaints of lower right back pain since an "injury to back first of month" (R. R. 267).  He was seeing Dr. Hart, and taking Xanax, Lorcet, and muscle relaxant.  He was diagnosed with acute lumbar myofascial pain "based on Pt not willing to move."  Plaintiff refused ultracet and naprosyn and said he could not take darvocet.  He wanted Percocet.  He was given Flexeril and ultracet, told to use heat and rest, and to follow up with Dr. Hart (R. 267).

Plaintiff had an MRI of the lumbar spine on July 7, 2003, which showed multi-level degenerative disc disease at the lower three levels with bulging of the disc material.  There was no frank herniation or central stenosis, but conceivable potential for neural impingement laterally.  "This is probably most likely at L3-4 on the right, thought the appearance is considered equivocal

and correlation with symptomatology is recommended."

On September 4, 2003, Plaintiff saw neurologist James Weinstein, MD upon referral of his regular provider, Ernest Hart, MD (R. 220). Dr. Weinstein noted Plaintiff was 38 years old and his work involved carpentry formation of concrete forms. He suffered a work injury on August 27. He had a long history of back problems. He had symptoms in the low back radiating into the right hip. Upon examination, Dr. Weinstein noted positive straight leg raising, which possibly indicated 4/5 disc herniation or nerve root compression. Dr. Weinstein also reviewed a July 7 (pre accident) MRI which showed a relative stenosis with suggestion of some 3/4 compression on the right, but the pathology was not overt and would not indicate surgery; however, because Plaintiff had since suffered the new injury the doctor was "concerned" he might have a herniated disc above what was seen on the 6-week-old MRI. Dr. Weinstein recommended another MRI and until then recommended treatment of symptoms.

Plaintiff had an MRI of the lumbar spine on September 23, 2003, which showed disc degeneration at the lower three levels without evidence of disc herniation; asymmetric bulging of disc material toward the right side at L3-4 which "could conceivably effect the exiting nerve root laterally but there is no central stenosis" (R. 262).

On November 6, 2003, Plaintiff presented to the hospital with acute lower back pain, needing a medication refill (R. 258). He said his doctor was in the hospital with pneumonia, and he was unable to find another doctor. Old records were reviewed which included an MRI showing bulging disc at L3-4 on the right. He was diagnosed with chronic lower back pain and discharged with Lorcet, Alprazolam, and told to rest, use heat and do no heavy lifting or bending.

On October 19, 2004, Plaintiff saw Dr. Mohamed Fahim, MD, the Medical Director of the Pain Management Center at Davis Memorial Hospital upon referral by Dr. Rahman (R. 333). Upon examination, Plaintiff could walk on his toes and his heels. His gait was slow but steady. Straight leg raising was negative, at 70 on the right and 80 on the left. There was decreased range of motion at the waist. There was pain on flexion and tightness of the right paravertebral muscles. Sensation was intact and reflexes were intact. MRI done July 7, 2003, five weeks before the work injury, showed multi-level degenerative disc disease at the lower 3 levels of the lumbar spine, including bulging of disc material. There was no frank herniation or central stenosis. There was a potential for neural impingement laterally, most likely at L3-4 on the right. MRI on September 21, 2003, one month after the injury, showed degeneration at the lower 3 levels without evidence of disc herniation. Asymmetric bulging of disc material toward the right at L3-4 "could conceivably" affect the exiting nerve root but there was no central stenosis. Dr. Fahim's evaluation showed Plaintiff had degenerative disc disease of the spine with disc bulge at L3-4 on the right, along with myofascial pain syndrome of the back. He referred him for physical therapy and scheduled him for a series of lumbar epidural steroid injections. He discussed the injections with the plaintiff.

On November 27, 2004, Plaintiff presented to the hospital with complaints of being "out of meds–Lorcet" (R. 254). His doctor was "out of town." It was noted he was scheduled for an epidural the next week. He was given Lorcet and advised to contact his physician for additional medication.

On March 4, 2004, Plaintiff saw Dr. Weinstein (his first visit since September 2003), for follow up of his MRI (R. 219). Dr. Weinstein wrote:

> [The MRI showed] some questionable pathology at the foramen at 3-4 on the right. There may be a lateral disc herniation at that level and he may be a candidate for a

foraminotomy at that level. However, before doing that I want to get an L-3 nerve block on the right and to verify that is the source of his symptomology. In certain occasions such a block may also be curative. Surgery in that area is not ideal, but it certainly is indicated if we get good results from the nerve block and the patient decides he wants something done . . . .

Plaintiff's Workers' Compensation claim was ruled compensable in a decision dated September 16, 2004 (R. 181).

On September 24, 2004, Plaintiff saw Aamer Rahman, MD, for follow up of his workers' compensation injury (R. 216). Plaintiff said he had been doing well. He was currently taking Lorcet, Xanax, and Flexeril. He told the doctor he "was hit in the face with a prying bar 9/20/03 and since then has shooting pains in face once or twice a week." Dr. Rahman diagnosed back pain, and arranged for Plaintiff to undergo a spinal injection "as per Dr. Weinstein note. Says workers compensation are ready to pay for it." Plaintiff was to return "as needed."

Plaintiff returned to Dr. Rahman three months later, on December 28, 2004, with a chief complaint of diarrhea and nausea for the past two days (R. 213). His current meds were listed as "none." Dr. Rahman diagnosed gastroenteritis and back pain. Plaintiff said he was going to get shots from Dr. Fahim tomorrow. He said Dr. Fahmin had put him on baclofen and naprosyn but he could not afford them. Dr. Rahman gave Plaintiff 15 days of lorcet and would see if he needed another 15 days after the shots.

On January 17, 2005, Plaintiff saw Dr. Weinstein for follow up (his last visit being 10 months earlier, in March 2004) (R. 218). Dr. Weinstein noted that in March 2004 he had recommended an L3 nerve block on the right "but for whatever reason he has not obtained this, and we will try to make the arrangements." Dr. Weinstein was reluctant to perform surgery "because his 3-4 pathology is questionable, but nevertheless, enough that I think a nerve is indicated." He would

see Plaintiff back "after the nerve block, if he's not doing well."

On February 2, 2005, Plaintiff underwent an examination by Joseph Grady, MD for the workers' compensation division (R. 313). Dr. Grady noted the July 7, 2003, MRI which showed there was multilevel degenerative disk disease with disk bulging but no actual definite disk herniation (R. 313). He was treated conservatively and had no physical therapy at that time. He was treated with pain medications. After his work accident in August 2003, he was referred to see neurosurgeon Weinstein. Weinstein noted in a letter that he recommended a repeat MRI, which was done September 21, 2003, and showed "again that there was degenerative disk disease of the lower three levels without definite disk herniation." Plaintiff began seeing Dr. Rahman who referred him to Dr. Fahim for pain injections; however, Plaintiff stated he had a "longstanding history of getting quite concerned about having injections. He states that he has a great fear of needles and was quite hesitant to have any injections in his lower back. Because of this, he wished to have a second opinion with the neurosurgeon to try and determine whether or not the injections are really needed."

He saw Dr. Weinstein for a second opinion, stating that "Dr. Weinstein did not recommend the lumbar epidural steroid injections but did suggest an L3 nerve block might be more useful." He was scheduled to have that done, but then became "too anxious to have the nerve block injections." He states the doctor performing the procedure told him he could not be sedated because he would have to remain awake and alert and be able to inform them of how he felt. He was unable to tolerate having the injection done. He was supposed to see Dr. Weinstein afterward but had not done so yet. He also stated he did not think he could "tolerate an EMG/nerve conduction study or myelogram."

On examination, the back did not have any increased redness, warmth or swelling. He did report some tenderness to palpation of the lumbar paraspinal muscles bilaterally as well as of the

bilateral SI joints. He used no assistive device, and his gait was not lurching, unsteady or unpredictable. He was able to ambulate around the room and get up on the examination table but did have complaints of lower back discomfort with activity. His mood and affect were normal.

Straight leg raising sitting was 40 degrees bilaterally with complaints of pain in the lower back but no radiation into the legs. Straight leg raising in the supine position, however, was less than 5 degrees for either leg, with complaints of pain in the lower back with basically any attempt. When attempting to go 5 degrees with either leg, he stated he could not really do any more due to discomfort.

Dr. Grady found Plaintiff to be at maximal medical improvement (R. 318). He suggested a functional capacity evaluation to help delineate his capabilities. He was not optimistic Plaintiff could return to his previous job, but otherwise deferred to the FCE for his functional capabilities. With regard to an impairment rating for his lower back, Dr. Grady would find a 5 percent impairment of the whole person noting his flexion and extension were inconsistent and obviously limited by complaints of pain, and therefore invalid for impairment rating. Right lateral flexion was normal. He would be entitled to a one percent impairment for left lateral flexion. There was no sign of any lumbar radiculopathy. He would therefore have a total 6 percent impairment of the whole person by the Range of Motion model.

On the Low Back Examination Form Dr. Grady noted that Plaintiff stood unassisted, and had no scoliosis, antalgic lean, lumbar hypolordosis or lumbar hyperlordosis (R. 322). He had no vertebral tenderness or coccyx tenderness on palpation. His pelvis was level standing. He had paraspinal muscle tenderness, and sacroiliac joint tenderness but no muscle spasm. He had no assistive device or disturbance of gait. Much of his range of motion of the lumbar spine was limited

due to pain, not restriction. Dr. Grady signed the Range of Motion Certification stating that Plaintiff did not pass the validity test.

On February 9, 2005, Plaintiff underwent a CT scan of the lumbar spine, that was originally scheduled for a nerve root block. Significantly, however: "Patient was positioned in scanner after informed consent and lumbar spine was scanned. Patient at this point decided not to have the procedure done and no intervention was undertaken."

The CT scan showed "moderate diffuse posterior disc bulge noted at L3-4 with disc material extending into the inferior aspects of neural foramina and possibly contacting the exiting L3 nerve root on the left." (R. 221).

On March 16, 2005, Plaintiff returned to Dr. Rahman for follow up and medication refills (R. 211). Dr. Rahman diagnosed back pain and noted he "went to see Dr. Weinstein who was going to inject his back. Pt. says he chickened out when he saw the size of the needle. Has another appointment April 1st. Also had IME and was told that has reached maximal medical improvement." Dr. Rahman gave Plaintiff pain medication (Lorcet) for two months and a refill of his Xanax (1 mg. twice a day as needed). His next appointment was in two months.

On March 22, 2005, the State Workers Compensation Division granted Plaintiff a Permanent Partial Award of 6% whole person impairment due to his work injury (R. 180). Plaintiff appealed this decision to the Workers' Compensation Administrative Law Judge, who, on March 9, 2007, reversed the order and granted him an 8% award (R. 183).

Plaintiff followed up with Dr. Rahman on May 17, 2005, "for f/u up on workmans' comp." (R. 209). Plaintiff told Dr. Rahman he had "started doing some light work. Workers compensation has finally started to pay a little. Has not seen Dr. Weinstein since Jan."

On this date, Dr. Rahman diagnosed shooting pains in the face once or twice a week, degenerative arthritis of the spine–disc disease, anxiety, and myofascial syndrome. Plaintiff said he was going to see Dr. Weinstein in June. He was to undergo conservative pain management. Dr. Rahman gave him refills of Lorcet and Xanax, and noted he was going to be leaving the practice.

Plaintiff had an FCE completed at Elkins Physical Therapy on June 9, 2005 (R. 195). He began treatment on July 18, 2005, and was to be treated daily for 4-6 weeks, gradually increasing activities to his tolerance (R. 195). Plaintiff cancelled the next day and did not show the day after (R. 194). On July 27, 2005, he reported increased, more intense pain for a week since his last (only) appointment. The next day, Plaintiff reported tolerating the exercise well with no significant increase in pain with activities. The assessment was that Plaintiff had "some muscular pain [with] activity but, overall, tolerate[d] activity well." On the 29th, Plaintiff reported he was doing better since the first visit and he had kept up his walking. He had a little more difficulty with the current levels but completed the tasks with a mild amount of pain. On August 1, 2005, Plaintiff said he had been tolerating his exercises well without significant lasting increase in pain, although he had to take Loracet to be able to tolerate activities of daily living (R. 193). He was slowly increasing his tolerance to activities of daily living. The next day he continued to tolerate the exercises fairly well, but was still getting "some soreness after working out."

Plaintiff cancelled his physical therapy on August 3. On the 4th he said he had had increased pain the past day and a half. He struggled with exercises, and had a decrease in overall tolerance to activity. The therapist reported that Plaintiff subjectively continued to have fairly intense back pain limiting his tolerance to all activity. He had good days and bad days, with pain increased with more intense activity. Objectively, he remained limited to box lifting at approximately 20 pounds, and

continued to have intense pain in the lumbar paraspinals. There was slow progress with lifting, prompting the therapist to opine that "[i]t would be difficult for him to return to his prior level of lifting at the end of the month . . . ." He was to continue therapy.

On August 5, Plaintiff report he felt "weak," and hadn't felt well all week (R. 192). He was able to compete all exercises with better repetition, production, and less rest needed between sets. Three days later, Plaintiff still complained of stiffness and pain in his low back, and felt it would be difficult to return to his previous intensity of work. He performed exercises but guarded during all lifting tasks. His tolerance to activity continued to slowly increase. Plaintiff cancelled the next day.

On August 10, 2005, Plaintiff told his physical therapist he was "sore from work he had to do at home recently" (R. 192). He did his exercises that day but "still fe[lt] unable to perform any lifting from below waist height." He had very limited tolerance to exercises. Plaintiff cancelled the next day and did not show the day after that.

Plaintiff saw S. Parviz, MD, who had replaced Dr. Rahman, on August 16, 2005, for medication refills and follow up of his workers compensation (R. 207). Plaintiff told Dr. Parviz he had a ruptured disc at L3 from doing concrete work, and that a 2003 MRI showed the herniated disk. He was undergoing physical rehabilitation and his neurosurgeon was Dr. Weinstein. Plaintiff said his pain was 8 on a scale of 1-10 and at times he could not do anything. Lorcet did not control the pain. It went down his right hip. He also had tingling and numbing in the right hip. If he stood up and did some activity like cooking it started hurting and if sitting in a car it got bad. He was to undergo a Functional Capacity re-evaluation the next day. He was taking Lorcet and Xanax.

Upon examination, Plaintiff was tender in the paralumbar area (R. 207). Dr. Parviz diagnosed lumbar herniated disc disease at L-3, tobacco dependence, chronic pain, anxiety disorder,

and inspiratory wheeze (R. 208). Dr. Parviz opined that Plaintiff's pain was not under control. He would start him on Avinza "for decreasing pain medication requirement," and would gradually up the dosage as tolerated. He was to return in one month.

On August 17, 2005, Plaintiff told his physical therapist he had new pain medication, noting that the previous medications did not help much (R. 191). The therapist found Plaintiff could walk for up to one hour. It was likely a plateau had been reached, however. The therapist completed a form reporting that Plaintiff had undergone a month of work conditioning with a slight improvement in his tolerance to activity (R. 189). Plaintiff said his overall pain remained the same although he was now more able to perform walking and had started trying to ride his bike. Objectively, the therapist reported Plaintiff's PDC level had improved from sedentary-light to light, noting that was still "well below what would be required to return to his previous occupation." Plaintiff still complained of stiffness through the lumbar region. The therapist opined that the slight progress over the past month was not enough to recommend further work conditioning, and that Plaintiff would likely "not be able to return to the type of work he was doing before." He was discontinued from physical therapy and work conditioning due to lack of significant progress. The therapist completed a Functional Capacity Evaluation with opined Plaintiff's work classification was "light." (R. 190).

Plaintiff returned to Dr. Parviz on September 15, 2005, for follow up of his back pain and to discuss his medications (R. 205). Plaintiff said he had been on Avinza for back pain but said Workers' Comp would not pay for it. Nevertheless pain was the same at 8/10, and controlled on Lorcet and Avinza. He refilled his Lorcet.

Dr. Parviz noted that Plaintiff walked every day and rode a bike (R. 205). Upon exam his right paralumbar area was tender. There was no loss of fine sensation to touch in the leg. Power in

the right leg was slightly weaker than on the left.

Dr. Parviz diagnosed Degenerative Joint Disease of the lumbar spine. He wrote to Workers' Compensation that Plaintiff could go back to light work-related activity based on his FCE evaluation, and that his anxiety was stable on medication. He was to discontinue Avinza, start MS Contin, and continue Xanax.

On October 3, 2005, three weeks after his last visit, Plaintiff presented to Dr. Parviz for follow up (R. 203). Plaintiff stated that he had been sick and had to make 10 contacts per week but only made half a contact t per week for the visit. He said he had diarrhea and his chest was heavy. He was sweating. He felt better the last two days. The MS Contin was helping his back and decreased his pain. His back hurt worse at night and he would like an additional nighttime dose. He felt he would be able to go back to work, and now could do cooking, laundry, and other daily activities. Plaintiff walked every day and rode a bike. He had lower lumbar area tenderness, but his power was now full in both legs. He was still diagnosed with DJD of the lumbar spin. His MS Contin was increased as requested. Dr. Parviz determined Plaintiff was "clinically improved."

On October 31, 2005, Plaintiff followed up with Dr. Parviz (R. 200). He told the doctor that vocational rehabilitation was trying to find a job which he would have to lift less than 25 pounds at maximum. He had not yet found a job. He said he was doing better with the pain on Lorcet 4 times a day and the needed Ms Contin. He said it hurt when he lifted stuff "and recently moved from one town to the other. He had to hire people to move it." He said he could stand still for only 10 minutes. He still noted walking every day and riding his bike.

Upon exam, Plaintiff had right sided paraspinal tenderness. Power was full in his legs. Sensation to fine touch was present in his legs. Plaintiff could bend backward and forward more

than 10-20 degrees, but had to bend his knees to touch his feet. Dr. Parviz diagnosed DJD of the lumbar spine, herniated disk of the lumbar spine, and chronic back pain on narcotics. Dr. Parviz wrote the following note to Plaintiff's workers' compensation claim manager:

> Please find the progress of Mr. Galford. I am giving him hydrocodone, oxycodone and ativan for his problems. Will give him hydrocodone and oxycodone for a month and will be checking UDS ["drug screens"] for compliance with medications.

On November 18, 2005, Plaintiff filed his Disability (DIB) application.

On November 30, 2005, Plaintiff presented to Dr. Parviz for follow up of his workers' compensation claim (R. 196). He told the doctor he had applied for Disability SSI. He said he had not been able to find a job. Significantly, despite Plaintiff being prescribed Lorcet, Xanax, and MS Contin, the drug screen showed Plaintiff negative for hydrocodone and benzodiazepine and positive for morphine. Plaintiff said his back did hurt and that he had been taking his medicine, and would like to be retested. He still reportedly walked every day and rode a bike.

Dr. Parviz noted right lower lumbar area tenderness. As his diagnosis he wrote:

> CHRONIC BACK PAIN. PATIENT'S UDS NEGATIVE FOR HYDROCODONE AND BENZODIAZEPINES. I HAD ASKED HIM SPECIFICALLY WHETHER HE HAD TAKEN HIS PAIN MEDICATIONS AND LORCET LAST TIME HE SAID HE HAD. UDS POSITIVE FOR MORPHINE. SHOWED PATIENT NARCOTIC CONTRACT WHICH MENTIONED WILL NOT GIVE PAIN MEDICINES IF VIOLATION OF THE CONTRACT. WILL GIVE PATIENT ONE MONTH OF HIS MS CONTIN, LORCET AND ATIVAN AND ADVICES [SIC] TO FIND SOMEONE FOR HIS PAIN ASAP. WILL BE AVAILABLE TO SEE HIM FOR HIS OTHER PROBLEMS.

(Caps in original).

Plaintiff presented to the hospital on December 30, 2005, for complaints of chronic low back pain and needing a medication refill (R. 243). He said he had been seen the month before by Dr. Parviz, and "Dr. P. wouldn't see pt. today." He had gone to the pain clinic one time only with Dr.

Fahim. He was provided a month's worth of Lorcet and MSContin, and was directed to go to only one MD or pain clinic for medications.

On January 3, 2006, State agency reviewer Stephanie Eddy completed a Physical Residual Functional Capacity Assessment ("RFC") based on DIB only (R. 229). She found that as of his Date Last Insured of September 30, 2004, Plaintiff was 39 years old with a GED and four years substantial gainful activity. She concluded there was "insufficient evidence prior to the DLI" (R. 229).

On January 5, 2006, State agency reviewing psychiatrist Jim Capage completed a Psychiatric Review Technique, based on the onset date through the DLI of September 30, 2004 (R. 230). Dr. Capage also found there was insufficient evidence of any psychiatric disorder prior to the DLI. He had no diagnosis and no mental evaluation to support a finding as of the DLI.

Plaintiff presented to the hospital on January 10, 2006, with complaints of chronic back pain and needing a refill of medications (R. 244). He had no physical complaints. He was discharged with refills of MsContin and Loracet after having a "lengthy discussion" with a nurse/social worker regarding follow up with a primary care physician. Notably, this took place two months in a row since Dr. Parviz had cut him off his narcotic medications due to non-compliance.

Plaintiff's claim for DIB was denied at the initial level on January 13, 2006.

On January 31, 2006, Plaintiff began seeing Edita Milan, MD at the pain clinic (R. 278). He had again run out of his medications. He told Dr. Milan that after his injury he saw Dr. Hart who ordered an MRI which showed ruptured discs at L3-5 and L5-S1 and degenerative disc disease at all lumbar levels. He told her he was then was referred to Dr. Weinstein who did not recommend surgery "so he was treated symptomatically and Dr. Weinstein would recommend surgery in 10 years." He then went back to Dr. Hart who prescribed Lorcet and Xanax. After Dr. Hart passed

away, Plaintiff went to Dr. Rahman, who again referred him to Dr. Weinstein and then to Dr. Fahmin at the pain management clinic. Meanwhile, Dr. Rahman left to go back to school and he was seen by Dr. Parviz, who added Avinza to his treatment. He took it for 1 month but it was too expensive "so he was changed to MS Contin." Workers' Compensation sent him to physical therapy for 6-8 weeks with little improvement. He underwent a Work Conditioning program in 2005, "but he was just unable to work anymore." He had a hard time sitting and standing "and he just couldn't carry on any more."

Upon exam, Plaintiff had a steady posture on walking. He could walk on heels and toes but with difficulty. He could not squat. He had marked restriction of ROM of the lumbar spine on forward bending, back extension and lateral flexion. No sensory or motor deficits were noted.

Dr. Milan diagnosed chronic low back pain; anxiety and depression; and untreated hypertension (R. 277). She prescribed MS Contin, Xanax, and Lorcet.

On February 2, 2006, Plaintiff presented to orthopedist Joseph Snead, MD, for an impairment evaluation at the request of counsel (R. 336). Plaintiff told Dr. Snead the pain was severe at times and on two occasions in the past three weeks he had to go to the emergency room for shots. Dr. Snead read the July 2003 MRI as revealing "some 3-4 disk disease, but no significant herniation," and the September 2003, MRI revealing "some right side bulge at 3-4" (R. 337).

On physical examination, Plaintiff appeared to be in some distress. He was extremely stiff and when he stood up he had a forward lean of 15 degrees and could not straighten up. With maximum effort he could stand at neutral. He did demonstrate tenderness but no spasm. He did not demonstrate any motor weakness or sensory deficit in the legs. In the sitting position he had back pain at 45 degrees. Supine he had pain when each leg was lifted only 10-12 degrees off the table.

Range of motion testing on the inclinometer demonstrated 10 degrees flexion, 0 degrees extension, 10 degrees right lateral flexion and 8 degrees left lateral flexion. He appeared to be making a good effort, he "was just unable to do so because of his previous injury."

Dr. Snead diagnosed "bulging lumbar disks and a very stiff back secondary to injury of 8/27/03." He found Plaintiff would have a 27% whole man impairment. He also signed that Plaintiff passed the validity test (R. 343).

Plaintiff filed his application for SSI benefits on February 14, 2006.

In a Function Report dated February 27, 2006, Plaintiff reported his daily activities as:

Make coffee take meds eat something watch the news till about noon lunch more meds walk to my mom's down the road come back to my apt. make T.V. dinner more meds the night news go to bed.

(R. 142). He prepared his own meals, consisting of frozen dinners and sandwiches, two or three times a day (R. 144). He did not drive because he had no car. He walked daily. He went shopping for food once a month.

On March 6, 2006, Plaintiff followed up with Dr. Milan for refills only–"no new complaints" (R. 275), On examination, he had lumbosacral tenderness, pain on straight leg raising at 5 degrees and no sensory or motor deficits (R. 275). Dr. Milan refilled his MsContin, Lorcet and Xanax.

On April 26, 2006, Plaintiff was examined by Susan Garner, MD for the State Disability Determination Service (R. 279). Plaintiff's chief complaints were degenerative disk disease and hip problems. Plaintiff said he was injured at work in August 2003, and an MRI showed L3-4 and L5-S1 herniated discs. He said he was referred to Dr. Weinstein who did not recommend surgery. He said the pain was constant and throbbing and cramping, radiating into his right leg. He had weakness of that leg. Bending, stooping, sitting or standing for prolonged periods exacerbated the pain, and

walking helped to relieve it sometimes. He had not been to a chiropractor, but went to physical therapy for "a while," with no relief. He was offered epidural steroid injections by pain management but refused them. He also reported severe anxiety disorder.

Upon examination, Plaintiff's gait was normal with no assistive devices or ambulatory aids. He had no difficulty arising from seated to standing or climbing up and down from the examination table. He appeared comfortable seated and supine. Upon examination of the lumbar spine there was no reproducible tenderness over the spinous processes or paravertebral muscle spasm. He had severe pain with any attempt at forward flexion and did not perform it past neutral. He could flex side to side, however, without difficulty. He had positive straight leg raise testing with any minimal movement on the right and left. He could stand on one leg at a time with support from the table. He could flex at the hips in a seated position and had no tenderness on palpation of the hips. He was unable to heel walk or toe walk due to low back pain. He could heel-to-toe walk and could squat.

Dr. Garner diagnosed low back pain, secondary to "disk herniation by history."

On May 1, 2006, Plaintiff was examined by psychologist Thomas Stein Ed.D. for the State DDS (R. 286). Plaintiff was accompanied by his girlfriend, who drove the half hour in a rental truck. Plaintiff was cooperative, polite, and subdued. His posture was leaning. His gait was adequate, with no assistance or ambulatory aids. Plaintiff's chief complaint was "I have chronic back pain, and since I ruptured disks, I can barely sit or stand. Also, I have bad anxiety and I feel nervous and I can't concentrate. I'm a different person now. Also, my right hip is very painful where the pain comes from the back into my lower hip. That's all I can think of."

Plaintiff reported frequent sleep disturbances, but no eating disturbances or crying episodes. His energy level was poor and his mood was "very bad–I feel overwhelmed." He denied any suicidal

ideations or previous attempts. He said he was "phobic" about "the death of one of [his] family members." He reported panic attacks every other day, and compulsive behaviors of counting his steps, the order that he dressed, and checking behaviors. He was traumatized when he found his brother killed in a construction accident. He reported recurrent flashbacks and nightmares connected to that incident.

Plaintiff's only inpatient hospitalization was for ear tubes at age 11 (R. 287). He was treated on an outpatient basis for "back disk ruptures, degenerative joint disease, and anxiety." He had been treated for anxiety since 1985, all by primary care physicians in the form of medication only.

Plaintiff described his daily activities as arising at 7 a.m., taking care of his personal hygiene, making and drinking coffee, taking medications, showering, dressing, fixing and eating a light breakfast, making phone calls, visiting with his girlfriend and her granddaughter, visiting his mother, running errands to help his mother, visiting his girlfriend's mother or calling her on the phone, returning home and eating lunch his girlfriend fixed, doing some light housework, taking care of the baby, eating supper his girlfriend fixed, watching television, taking a short walk, more televison, and going to bed at 10 pm. He occasionally needed help putting on shoes and socks but otherwise could handle all personal care himself. He occasionally cooked, cleaned, and washed dishes, but did no laundry, yard work, or gardening. He occasionally did some light automobile mechanic work. He denied any grocery shopping, running errands, or driving. He walked short distances and occasionally read. He did not hunt or fish and denied having any hobbies.

Dr. Stein found Plaintiff had moderately deficient concentration, normal persistence, and moderately slow pace (R. 289). His social functioning was mildly deficient.

Dr. Stein diagnosed pain disorder associated with general medical condition and

psychological factors; posttraumatic stress disorder, chronic; and major depression, single episode, nonpsychotic.

Plaintiff presented to Dr. Milan for follow up on March 30, 2006 (R. 371). He had no new complaints but needed medication refills. Upon exam he had a steady posture on walking, and he walked on his heels and toes, but with difficulty. He could not squat. He had marked restriction of range of motion of the lumbar spine on forward bending, back extension, and lateral flexion. No sensory or motor deficits were noted. Dr. Milan diagnosed chronic low back pain, anxiety and depression, and hypertension by history. She refilled his MS Contin, Lorcet, and Xanax.

Plaintiff presented to Dr. Milan for follow up on May 4, 2006 (R. 372). He had no new complaints but needed his medications refilled. Upon exam Dr. Milan noted "marked restriction of motion of lumbar spine." Straight leg raising in the sitting position was positive at 4 degrees on the right and 5 degrees on the left. Supine straight leg raising was positive at 7 degrees on the right and 7 degrees on the left. Dr. Milan diagnosed chronic low back pain and anxiety and depression (R. 373). She prescribed MS Contin, Lorcet, and Xanax.

On July 3, 2006, State agency reviewing physician Fulvio Franyutti completed a physical RFC of Plaintiff, opining Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand/walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday (R. 291). He could never climb ladders, ropes or scaffolds or crouch or crawl, and could only occasionally perform all other postural limitations. He should avoid concentrated exposure to extreme cold, heat, vibration, and hazards.

Dr. Franyutti opined that the severity of Plaintiff's symptoms were consistent with the evidence, but that he did not require any assistance with personal needs or grooming, did light

housework, could walk 300 yards before needing to stop and rest, could resume walking in 5-10 minutes, and was able to walk without a cane and with a normal gait. All in all, Dr. Franyutti found Plaintiff appeared to be partially credible (R. 295).

Dr. Franyutti noted that at the initial level the claim was for DIB only but now was concurrent with SSI claim. He opined there was insufficient evidence before the Date Last Insured for the DIB portion of the case.

On July 12, 2006, State agency reviewing psychologist Frank Roman, Ed.D. completed a PRT, finding Plaintiff had an affective disorder and an anxiety-related disorder, but that neither was severe (R. 298). He opined Plaintiff would have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and had no episodes of decompensation (R. 308).

Dr. Roman expressly found there was insufficient evidence to establish disability on or before Plaintiff's DLI (R. 910).

Plaintiff's applications were denied at the reconsideration level on July 13, 2006.

On August 2, 2006, Plaintiff presented to Dr. Milan for follow up and refill of medications (R. 368). He had no new complaints. Upon exam he had marked restriction of ROM of the lumbar spine on forward bending, back extension and lateral flexion on either side. Straight leg raising on the right in the sitting position was positive at 4 degrees and on the left at 5 degrees. Straight leg raising in the supine position was positive at 7 degrees bilaterally.

In his Disability Report– Appeal, dated August 7, 2006, Plaintiff stated his pain had worsened recently, and he was now "possible bipolar disorder but have not received treatment yet" (R. 158).

On August 30, 2006, Plaintiff presented to Dr. Milan for follow up and refill of his medications (R. 369). He had no new complaints. Upon exam straight leg raising on the right was positive at 4 degrees sitting and 7 degrees supine. Straight leg raising on the left was positive at 5 degrees sitting and at 7 degrees supine. He was diagnosed with chronic lower back pain, anxiety and depression and prescribed Xanax, MS Contin, and Lorcet.

On November 2, 2006, Plaintiff presented to Dr. Milan for refills of his medication (R. 364). He requested additional MS Contin because the controlled release was not working for him. He was prescribed additional MS Contin along with his Lorcet and Xanax.

On December 1, 2006, Plaintiff presented to Dr. Milan for refill of medications (R. 368). He had no new complaints. Upon examination he had marked restriction of ROM of the lumbar spine on forward bending, back extension and lateral flexion on either side. Straight leg raising of the right lower extremity in the sitting position elicited pain at 4 degrees on the lumbosacral area and right hip and in the supine position at 7 degrees on the lumbosacral area. Straight leg raising of the left lower extremity in the sitting position elicited pain at 3 degrees on the lumbosacral area and right hip and in the supine position at 7 degrees on the lumbosacral area. No sensory or motor deficits were noted. Dr. Milan diagnosed chronic lower back pain, hypertension, anxiety and depression and refilled his Xanax, Lorcet and two MS Contin prescriptions.

On December 8, 2006, Plaintiff underwent an IME for workers compensation (R. 326). Upon examination he could stand unassisted with no scoliosis or antalgic lean. There was some hyperlordosis of the lumbar spine. There was no tenderness to palpation over the spine. There was no coccydynia with palpation. The pelvis was level standing. There was some paraspinal muscle tenderness bilaterally, but no muscle spasm. There was SI joint tenderness. He did walk with a

slightly antalgic limp. He reported occasional cane use. He declined to squat when asked, reporting expected pain. Flexion was 7 degrees, extension 11 degrees. Lumbar flexion was 8 extension was 8. Right side bending was to 20 degrees and left to 21 degrees. All were limited by pain.

Motor strength was full. Sensory examination was normal. Straight leg raise was to 85 degrees on the left with back pain, and 80 on the right, with back pain. Hip pain test was negative bilaterally. SI joint pain was positive on the right for low back pain, which did not localize well to sacrum and was negative on the left. Straight leg raising supine was 31 degrees on the left and 11 degrees on the right. Somatic amplification score was 4.

Dr. Werntz diagnosed Plaintiff with lumbosacral strain/sprain with a preexisting degenerative disk disease of the lumbar spine, spinal stenosis, and symptom magnification. He noted Plaintiff had little progress, and that his reluctance to be involved in any needle-based therapy severely limited the treatment options available. Dr. Werntz found Plaintiff was at maximum medical improvement. His limitations were not clear, and he could benefit from a functional capacity evaluation. He believed Plaintiff was probably functioning in the sedentary to light category, although he also believed that with significant functional restoration, especially psychological, his functioning could improve. He believed Plaintiff would benefit from a functional restoration program. He would not qualify for temporary total disability benefits.

Dr. Werntz opined Plaintiff had a lumbar spine impairment of 5% based on the range of motion model. Range of motion deficits would yield a 16% impairment of the whole person.

On January 22, 2007, Plaintiff presented to Dr. Milan for follow up and refill of medications (R. 353). He had no new complaints. Upon examination he had marked restriction of ROM of the lumbar spine on bending forward, back extension and lateral flexion on either side. Straight leg

raising of the right lower extremity in the sitting position elicited pain at 4 degrees on the lumbosacral area and right hip and in the supine position at 7 degrees on the lumbosacral area. Straight leg raising of the left lower extremity in the sitting position elicited pain at 3 degrees on the lumbosacral area and right hip and in the supine position at 7 degrees on the lumbosacral area. No sensory or motor deficits were noted. Dr. Milan diagnosed chronic low back pain, anxiety spells, depression and hypertension. She refilled his MS Contin 30 mg.; his MS Contin 15 mg. (for breakthrough pain); his Lorcet, and his Xanax.

On April 19, 2007, Plaintiff presented to Dr. Milan for follow up and medication refills (R. 356). He had no new complaints. Upon examination he had marked restriction of ROM of the lumbar spine but no sensory or motor deficits. Dr. Milan diagnosed chronic low back pain, hypertension, anxiety, and depression, and prescribed two different dosages of MS Contin, as well as Lorcet and Xanax.

Plaintiff appealed his Workers' Compensation award of 6% to the Workers' Compensation Administrative Law Judge, who, on March 9, 2007, reversed the order and granted him an 8% whole person impairment award (R. 183).

On March 22, 2007, Plaintiff presented to Dr. Milan for follow up and refill of medication (R. 355). Upon examination he had marked restriction of ROM of the lumbar spine when he bent forward, when he extended his back or when he bent to either the right or left. He was diagnosed with chronic low back pain, hypertension, anxiety spells, and depression. Dr. Milan refilled his two dosages of MS Contin, as well as Lorcet and Xanax.

On May 17, 2007, Plaintiff presented to Dr. Milan for follow up and refills of medications (R. 353). He had no new complaints. Upon examination his straight leg raising was exactly the

same as it had been at prior visits with Dr. Milan. He was diagnosed with chronic lower back pain, hypertension and anxiety and depression. He was continued on his two separate dosages of MS Contin, Xanax and Lorcet.

On May 25, 2007, an SSA interviewer observed that Plaintiff had difficulty sitting, standing, and walking, noting that he had to stand up during the interview; had difficulty getting up from seated position; and "walked like he was in pain, kind of hunched over and limping" (R. 133).

On July 18, 2007, Plaintiff presented to Dr. Milan for follow up, refills and a runny nose (R. 351). His range of motion and straight leg raising were noted identically to those in prior reports. He was diagnosed with chronic lower back pain, hypertension, anxiety, and depression, and prescribed Lorcet, Xanax, and two separate dosages of MS Contin.

On August 17, 2007, Plaintiff presented to Dr. Milan for refills only (R. 349). He had no new complaints. His ROM and straight leg raising remained identical to those during prior visits. He was diagnosed with chronic lower back pain, hypertension, and anxiety and depression, and prescribed Lorcet, Xanax, and two separate dosages of MS Contin.

Plaintiff's administrative hearing was held on September 18, 2007. He testified that he lived with his wife, whom he had married that past February (R. 49). They had been living together since at least the time of his work accident. His wife had custody of her 2 ½ year old granddaughter, who lived with them 90 percent of the time (R. 51). Plaintiff drove once or twice a week, usually just to the local store for milk for the baby. He had driven to the hearing the night before, a drive which would normally take about two hours, but took four hours because he had to stop about four times to get out and walk and stretch. He rarely drove by himself because his anxiety was too bad.

Plaintiff testified he had no income and a family member paid for his medications for about

the last year. Workers' Compensation continued to pay for medical visits but not for his medications. Plaintiff's wife had not worked since she began living with him (R. 53). She received Social Security for disability since about 2000, for problems including bipolar disorder and herniated discs in her neck and back.

Plaintiff testified he felt his most serious problem was the "ruptured disk" in his back (R. 63). He said that Dr. Weinstein recommended no surgery at the time, but had wanted him to have a nerve block. When he went for the procedure, however:

> [I] just couldn't take laying there. And the table would move as it took pictures of my back of the spine or the discs. It kind of jerked me and I have a fear of needles. And once I seen that thing they was going to stick in my back, I just got up and left, sir.

(R. 64). He said he then asked them for something to knock him out a little bit, but they would not do that because you had to be able to tell them where you felt certain things. Plaintiff testified he had physical therapy for at least three months (R. 64).

Plaintiff testified regarding his daily routine as follows:

> I get up 7:00, maybe earlier, depends on how my back feels. I make some - - usually put coffee on, take medication, probably make some toast or a cheese sandwich, something that I can prepare pretty easily, maybe something in the microwave. I set and watch the news. I might go out and sit on the porch a bit. And my wife will get up soon after that. Between the two of us, we try to take care of Janess [ph], which is the granddaughter. Depends on if we have doctor's appointments. We just kind of help each other out . . . .

(R. 68).

When asked why he would not be able to do a job where he could sit most of the day, Plaintiff testified he could not sit for very long. He had to get up and move around quite often; a lot of times he had to go for short walks. He lost concentration quickly.

Plaintiff testified that Workers' Compensation "washed their hands" of him, once he did not

complete the task of looking for ten jobs. Instead he had only looked for ½. When asked why he

fell behind in the job search he said that it was difficult getting out and applying for work, stating:

> Just going and applying for jobs is, you know, getting in an automobile, going to this
> place, to that place, walking into this place and that place, maybe sitting waiting on
> an interview, Once they find out you have back problems, they don't want anything
> to do with you because of I guess future compensation claims on their behalf . . . .

Plaintiff testified that at home he ran the vacuum cleaner maybe once a week (R. 71). He

liked to read and watch television. He did not hunt or fish or do any sports since his injury. He went

to church on Sunday and Wednesday and to revivals. These lasted approximately 1 ½ hours, but he

stayed in the back so he could alternate sitting and standing. He testified he had not ridden his bike

since the summer of 2003, although he had "tried to ride it a few different times, but it just seemed

like I was pushing more with my left foot and just felt awkward" (R. 63). He further testified he had

ridden his bike only "a couple times after the injury[,]" and that the last time he rode it was to

physical therapy one time in 2005. He had to push it back.

The ALJ asked the VE if there would be any jobs available for a hypothetical person with

Plaintiff's background, who was limited to light work with only occasional climbing of ramps or

stairs or balancing stooping or kneeling. He could never climb ladders, ropes or scaffolds, or do any

crouching or crawling. He could not work in extreme heat or cold for long periods of time or with

equipment with high amounts of vibration, at unprotected heights or around dangerous moving

machinery (R. 89). The VE testified that there would be a significant number of jobs that

hypothetical person could perform in the national economy or the State of West Virginia.

When the ALJ added the limitation that the individual would not be able to do jobs that

would require more than occasional contact with the general public, co-workers or supervisors, the

VE testified there would still be a significant number of jobs available.

If the person could stand or walk a total of 6 hours in an 8-hour workday or sit for 6 hours in an 8-hour workday, but would have to be able to get up or move around about one an hour (a sit/stand option) there would still be a significant number of jobs (R. 91).

If the person needed to work at the sedentary level, but could stand or walk only 2 hours in an 8-hour workday and no more than 15 minutes at a time; and could sit for 6 hours in a workday but would need to change position every half hour, there would still be a significant number of jobs available (R. 91).

Finally if the person would be off task two hours in an eight-hour workday or off three days a month for various reasons, there would be no jobs.

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2004.

2.  The claimant has not engaged in substantial gainful activity since August 27, 2003, the alleged onset date (20 CFR 1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; depression; and anxiety (20 CFR §§ 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light unskilled work with no more than occasional contact with the public, although frequent contact with co-workers and supervisors would be acceptable. The claimant can stand/walk, in 20 minute intervals, for six hours in an eight-hour workday, and sit in on-hour intervals for six hours in an eight-hour workday. He must work in a controlled environment with no exposure to hot or cold temperature extremes for long periods of time and no vibration of equipment, requiring no more than occasional balancing, stooping, kneeling, climbing of stairs/ramps, and no crouching, crawling, climbing of ladders/ropes/scaffolds or exposure to hazards such as dangerous and moving machinery or unprotected heights.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on May 11, 1965, and was 38 years old, which is defined as a "younger individual" age 18-49, on the alleged disability onset date (20 CFR §§ 404.1563 and 416.963).

8.  The claimant has at least a "high school education" and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 10 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c0, 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 27, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 15-33).

## IV. Contentions

A.  Plaintiff contends:

1. The Commissioner improperly discounted the claimant's credibility without providing sufficient reasons supported by the evidence in the case record.

2. The ALJ's finding that the claimant is capable of work that exists in substantial numbers in the national economy is not based on substantial evidence.

B. The Commissioner contends:

1. The ALJ provided sufficient reasoning for why he determined Plaintiff's claims were only partially credible, and the ALJ's determination that Plaintiff could perform a wide-range of unskilled sedentary and light work with his credible subjective complaints is supported by substantial evidence.

## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>citing</u> <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984)(<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Credibility

Plaintiff first argues that the Commissioner improperly discounted his credibility without providing sufficient reasons supported by the evidence in the case record. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984) (citing <u>Tyler v. Weinberger</u>, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.  A review of the ALJ's Decision shows he clearly found Plaintiff had met the threshold step – he had medically determinable impairments that could reasonably be expected to produce the alleged symptoms.

A review of the Decision also shows that ALJ's credibility evaluation did take into account Plaintiff's statements about his pain, his medical history, medical signs and laboratory findings, objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, and redness), evidence of his daily activities, specific descriptions of the pain, and medical treatment taken to alleviate it.

The ALJ began his thorough discussion of Plaintiff's medical history back in June 2003, when he was diagnosed with a myofascial strain. He discussed the medical signs and laboratory findings, including an MRI on July 7, 2003, revealing multi-level degenerative disc disease at the lower three levels, including bulging of the disc material but no frank herniation or central stenosis. He discussed the second MRI, performed only months later after Plaintiff's work injury, which again showed disc degeneration at the lower three levels without evidence of disc herniation or central stenosis. He discussed the objective evidence of pain, including a number of range of motion tests. He discussed Plaintiff's reported daily activities and the medical treatment Plaintiff underwent to alleviate his pain.

Regarding treatment, the ALJ noted that in March 2004, Dr. Weinstein recommended an L-3 nerve block, not only for possible pain reduction, but also as a tool to determine if surgery was indicated.  If Plaintiff had good results, surgery might be helpful.  Dr. Rahman noted in September 2004, that Dr. Weinstein assessed "back pain" and recommended a spinal injection.  Dr. Fahim saw

Plaintiff in October 2004and referred Plaintiff for physical therapy and scheduled him for epidural steroid injections, after fully discussing these with Plaintiff.  In November 2004, Plaintiff stated at the ER that he was scheduled for an epidural the following week.  In January 2005, however, Dr. Weinstein noted Plaintiff had never had the recommended L3 nerve block, and told him he "needed" to have it. Finally, Plaintiff told Dr. Grady in February 2005, that he had never had the lumbar epidural injections because of a fear of needles, and that he wanted to have a second opinion with the neurosurgeon to determine if they were really needed. Dr. Grady, however, noted Dr. Weinstein, who is a neurosurgeon, had recommended an L3 nerve block which had also been scheduled and then refused.  Plaintiff explained that he had been too anxious to have the nerve block injection.  He told Dr. Rahman in March 2005, that he had "chickened out" but had another appointment April 1, 2005.

20 CFR section 416.930 explains what treatment a claimant must follow, in pertinent part:

(b) If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .

(c) . . . . The following are examples of a good reason for not following treatment:

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
(2) The prescribed treatment would be cataract surgery for one ye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
(4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
(5) The treatment involved amputation of an extremity, or a major part of an extremity.

In Nissen v. Astrue, 131 Soc. Sec. Rep. Serv. 1030 ( N.D.Iowa 2008), the Northern District of Iowa discussed a case in which the claimant reported back pain but declined an injection because

he didn't like needles, despite his doctor's opinion that "it would be really helpful for him." The claimant rejected injections at least twice more, "again due to his fear of needles." Finally, nearly a year after his work injury, the claimant stated he was willing to have the injections. His doctor encouraged him to go through with it, stating it seemed "[k]ind of silly to have ongoing severe pain and then not follow up with the recommendations to fix it." The claimant, however cancelled the appointment, simply saying he "was not going to go through with it." The doctor stated he would no longer see the claimant for his back pain. Two months later, the claimant told the doctor he was fearful of injections. The court found that the claimant's ongoing refusal to follow through with his treating physicians' treatment recommendations undermined the credibility of his subjective complaints.

Similarly, in <u>Colgrove v. Astrue</u>, 2008 WL 974838 (E.D.Tenn., 2008) the claimant rejected myelography and epidural steroid injections, as did Plaintiff, recommended by the treating neurologist. The court found this "inconsistent with the conduct that would be expected from a person who suffers from the extreme limitations alleged."

In <u>Castle v. Astrue</u>, 125 Soc. Sec. Rep. Serv. 279 (E.D. Tenn. 2008), a claimant also claimed "fear of needles" prevented him from receiving recommended treatment. The court stated: "A claimant who does not follow 'prescribed treatment without a good reason' is not disabled." The court then cited the examples of "good reasons" from 20 C.F.R. section 416.930(b), and found the claimant's "fear of needles" was not a good reason for his failure to follow prescribed treatment.

The undersigned likewise finds that Plaintiff's alleged "fear of needles" not a good reason for his failure to get the L-3 nerve block recommended by his treating neurologist, which Dr. Weinstein opined might not only relieve his pain, but would also be helpful in diagnosis; or the

epidural recommended by Dr. Fahim, another treating specialist. Dr. Weinstein actually informed Plaintiff he "needed" to get the injection. Significantly, a year after the first injections were recommended, Plaintiff told yet another physician, Dr. Grady, that he did not have the epidural recommended by the pain specialist, Fahim, because he wanted "a second opinion" from the neurologist. Dr. Grady actually noted that "the neurologist" Dr. Weinstein, had recommended a nerve block, which Plaintiff also failed to have.

Plaintiff was also prescribed physical therapy. Despite testifying he had several months of physical therapy, he actually went for only about a month, during which time, he missed five appointments. By August 5, 2005, only three weeks after beginning therapy, he was able to complete all exercises with better repetition, production, and less rest periods. Plaintiff cancelled therapy on August 9, later stating he was "sore from work he had to do at home recently." He then "no-showed" two days. Despite the short course of physical therapy and the five missed sessions, Plaintiff's physical therapy assessment revealed that he had improved to the light exertional level during treatment.

Regarding Plaintiff's own reported daily activities, the ALJ noted that Plaintiff told Dr. Parviz in September 2005, that he walked every day and rode his bike. Plaintiff reported again in October 2005 that he walked and rode his bike every day.

Plaintiff also argues that the ALJ ignored his "duty to consider the consistency of the claimant's statements." Plaintiff quotes SSR 96-7p which provides: "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." Plaintiff then argues that the record in this case provides ample documentation of consistent statements made by the claimant regarding his pain and anxiety

symptoms affecting his daily activities, persistence and pace, both in this proceeding and in statements made to his medical providers. A review of the decision as well as the record indicates, however, that Plaintiff's statements were not consistent with other statements made by him, or by those made by providers.

As the ALJ correctly notes, Plaintiff told Dr. Parviz that he had a "ruptured disc," and that the 2003 MRI showed a herniated disc. In other inconsistent statements, Plaintiff told personnel at the ER on December 30, 2005, and January 2006, that he had ruptured his L3 in 2003. Plaintiff told Dr. Milan in January 2006, that his first MRI in 2003 showed ruptured discs at L3-L5 and L5-S1 plus degenerative disc disease on all lumbar levels. He also testified he had a "ruptured disc." There is, however, no diagnosis in the record of ruptured disc.

Plaintiff also told Dr. Milan that after his injury he saw Dr. Hart who ordered an MRI which showed ruptured discs at L3-5 and L5-S1 and degenerative disc disease at all lumbar levels. He told her he was then was referred to Dr. Weinstein who did not recommend surgery "so he was treated symptomatically" and Dr. Weinstein "would recommend surgery in 10 years." None of these statements, made to a treating physician, is supported by the record. Plaintiff told Dr. Garner in April 2006, that his 2003 MRI showed L3-L4 and L5-S1 herniated disc, and that he was seen by a physician the day after the injury, all of which are inconsistent with the record. Plaintiff told Dr. Parviz that Workers' Compensation had "washed their hands of him" because he only made ½ job contact in the week instead of the required ten. Plaintiff explained to the doctor, however, that he had been unable to make more than the ½ contact because he had been "sick." He testified, however:

Just going and applying for jobs is, you know, getting in an automobile, going to this

> place, to that place, walking into this place and that place, maybe sitting waiting on
> an interview. Once they find out you have back problems, they don't want anything
> to do with you because of I guess future compensation claims on their behalf . . . .

This testimony is totally inconsistent with his claim, made to a provider, that he had not gone to the interviews because he had been sick, and shows not that he was sick, but that he was frustrated and unwilling to comply with the process (after only ½ a contact).

As to the cause of his injury, Plaintiff told Dr. Milan he injured his back after putting a load down, when he felt a severe back pain which radiated down to both knees. A year later he told Dr. Werntz that he was carrying concrete forms and fell to his knees, slipping, and jammed his back. There was no earlier report even at the time of the injury that he slipped and fell.

Despite Plaintiff's argument, the ALJ is correct that Plaintiff told Dr. Parviz in September 2005, that he walked every day and rode his bike. Plaintiff reported again in October 2005 that he walked and rode his bike every day. He testified at the hearing, however, that he had not ridden his bike since the summer of 2003, although he had "tried to ride it a few different times, but it just seemed like I was pushing more with my left foot and just felt awkward" (R. 63). He further testified he had ridden his bike only "a couple times after the injury[,]" and that the last time he rode it was to physical therapy one time in 2005. He had to push it back.

The ALJ also noted that in May 2005, Plaintiff reported he believed he would be able to go back to work because he could now do cooking, laundry and other daily activities. He testified, however, he did no work around the house except for maybe washing a plate after he ate or vacuuming once a week.

Plaintiff's claims of disabling back problems are also inconsistent with doctor reports. Dr. Parviz found Plaintiff could go back to light work related activity. Further, Dr. Parviz was

prescribing Lorcet, MS Contin, and Xanax to Plaintiff in 2005. He referred Plaintiff for drug testing in November 2005, however, which determined that Plaintiff was negative for Hydrocodone and Benzodiazepines, but positive for morphine. Dr. Parviz advised Plaintiff to find another physician for his pain medications, because he had broken his narcotics contract. Dr. Grady noted Plaintiff's flexion and extension were inconsistent and invalid for impairment rating.

Dr. Werntz diagnosed Plaintiff with spinal impairments, but also with symptom magnification. He noted Plaintiff's reluctance to be involved in any needle-based therapy severely limited the treatment options available. His limitations were not clear, and he could benefit from a functional capacity evaluation. He believed Plaintiff was probably functioning in the sedentary to light category, although he also believed that with significant functional restoration his functioning could improve.

The ALJ properly took all this evidence into consideration in forming his opinion regarding Plaintiff's credibility. The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's testimony regarding his symptoms was only partially credible.

### C. Hypothetical to the VE

Plaintiff next argues that the ALJ's finding that he is capable of work that exists in substantial numbers in the nation economy is not based on substantial evidence, because the ALJ failed to adequately include the limitations presented by the Plaintiff's impairments. In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. Plaintiff cites the ALJ's failure to give appropriate weight to the medical evidence and to improper discounting of his credibility. The undersigned finds, however, the ALJ made a thorough analysis

of the medical evidence, including, significantly, Plaintiff's failure to follow doctors' instructions which may have led to at least a decrease in his pain and functional limitations. Further, as the undersigned has already found, substantial evidence supports the ALJ's determination that Plaintiff's complaints of pain and limitation were only partially credible.

Plaintiff in particular notes the ALJ's failure to ask a hypothetical including his mental impairment of anxiety. The ALJ, however, considered that Plaintiff did not have a history of any treatment with a psychologist or psychiatrist, but only received medication from his primary care provider. Dr. Parviz opined that Plaintiff's anxiety was stable on medication. If a symptom can be reasonably controlled by medication or treatment, it is not disabling. Gross v. Heckler, 785 F.2d 1163 (4th Circ. 1986). Moreover, Plaintiff had been treated for anxiety since 1985, all by primary care physicians in the form of medication only. In Cauthen v. Secretary, 426 F.2d 891 (4th Cir. 1970), the Fourth Circuit found that although the Plaintiff had a severe eye impairment, "the problem is one of longstanding, and she has worked regularly for may years affected to virtually the same extent as present." Ability to work with the impairment is evidence it is not disabling.

On July 12, 2006, State agency reviewing psychologist Frank Roman, Ed.D. completed a PRT, finding Plaintiff had an affective disorder and an anxiety-related disorder, but that neither was severe (R. 298). He opined Plaintiff would have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and had no episodes of decompensation (R. 308). 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency
> medical or psychological consultants, or other program physicians or psychologists.

However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Plaintiff himself stated in a Function Report dated in March 2006, that he lived alone, went out alone, shopped, went to church, had no problem getting along with others, got along "good" with people in authority, had no problem with memory and concentration, could pay attention all day, and handled changes in routine "good."

Despite the mild findings, the ALJ did actually ask a hypothetical of the VE containing limitations due to mental impairments. He limited Plaintiff to unskilled jobs that would not require more than occasional contact with the general public. These limitations are clearly not caused by Plaintiff's physical impairments, but by his mental impairment. Further, even when the ALJ limited Plaintiff to only occasional contact with the public as well as co-workers and supervisors, the VE still testified a significant number of jobs would exist.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's hypotheticals to the VE and his reliance on the VE's testimony in response to those hypotheticals.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for SSI and DIB is supported by substantial evidence, and I accordingly respectfully recommend Defendant's Motion for Summary Judgment [Docket Entry 23] be **GRANTED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 21] be **DENIED** and this matter be dismissed and stricken from the Court's record.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _8_ day of December, 2010.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE